## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| RUSSELL HANSON<br><br>                    Plaintiff,<br><br>v.<br><br>BIOMET, INC., BIOMET ORTHOPEDICS, LLC, BIOMET U.S. RECONSTRUCTION, LLC, BIOMET MANUFACTURING, LLC, f/k/a BIOMET MANUFACTURING CORPORATION, and ZIMMER BIOMET HOLDINGS, INC.<br><br>                    Defendants. | Civil Cause No.<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Russell Hanson ("Plaintiff")  residing in Nokomis County of Sarasota and State of Florida, by way of Complaint against Defendants; BIOMET, INC.; BIOMET ORTHOPEDICS, LLC; BIOMET U.S. RECONSTRUCTION, LLC; and BIOMET MANUFACTURING, LLC, f/k/a BIOMET MANUFACTURING CORPORATION (hereafter collectively referred to as "Biomet" or "Biomet Defendants"); ZIMMER BIOMET HOLDINGS, INC. (hereafter referred to as "Zimmer Biomet Holdings") (hereafter Biomet Defendants and Zimmer Biomet Holdings are collectively referred to as "Zimmer Biomet Defendants" or "Zimmer Biomet.")

## PARTIES, VENUE AND JURISDICTION

1. This is a lawsuit regarding a defective metal on metal hip replacement system implanted in Plaintiff, Russell Hanson, which was designed, developed, manufactured, labelled, promoted, marketed, sold, and supplied by Defendants.

2. The particular hip replacement system at issue in this case is the "Biomet M2a Metal on

Metal Hip Replacement" which includes both the Biomet M2a-38 and the Biomet M2a-Magnum (hereafter referred to as the "M2a").

3. Russell Hanson was implanted with the Biomet M2a Magnum metal on metal hip replacement in the State of Ohio.

4. At the time the M2a caused Russell Hanson injury, he was a resident of Florida. He underwent revision surgery of the M2a city of Jacksonville, county of Duval, State of Florida.

5. At all times relevant to this Complaint, Defendant BIOMET, INC., was and is an Indiana-based multinational corporation, with its corporate headquarters in Warsaw, Indiana and facilities world-wide.

6. Defendant, BIOMET ORTHOPEDICS, LLC is a limited liability company organized and existing under the laws of Indiana with its principal place of business in Warsaw, Indiana. The sole member of BIOMET ORTHOPEDICS, LLC is BIOMET U.S. RECONSTRUCTION, LLC., which is incorporated in Indiana and has its principal place of business in Warsaw, Indiana.

7. At all relevant times, BIOMET ORTHOPEDICS LLC designed, manufactured, marketed, promoted, sold and introduced into interstate commerce, either directly or indirectly, the Biomet Hip Systems that are the subjects of this lawsuit.

8. Defendant, BIOMET ORTHOPEDICS, LLC is a limited liability company organized and existing under the laws of Indiana with its principal place of business in Warsaw, Indiana. The sole member of BIOMET ORTHOPEDICS, LLC is BIOMET U.S. RECONSTRUCTION, LLC., which is incorporated in Indiana and has its principal place of business in Warsaw, Indiana.

2

9. At all relevant times, BIOMET ORTHOPEDICS LLC designed, manufactured, marketed, promoted, sold and introduced into interstate commerce, either directly or indirectly, the Biomet Hip Systems that are the subjects of this lawsuit.

10. BIOMET MANUFACTURING, LLC, f/k/a BIOMET MANUFACTURING CORPORATION is a limited liability company organized and existing under the laws of Indiana with its principal place of business in Warsaw, Indiana.  The sole member of BIOMET MANUFACTURING, LLC is Chad F. Phipps., who is domiciled in Indiana.

11. Defendant BIOMET MANUFACTURING, LLC, f/k/a BIOMET MANUFACTURING CORPORATION designed, manufactured, marketed, promoted, and sold the Device that was implanted into Plaintiff's body and is the subject of this action.

12. At all times relevant herein, the Biomet Defendants were the agents of each other, and in doing the things alleged herein, each Defendant was acting within the course and scope of its agency and was subject to and under the supervision of each and every other Defendant herein. Specifically, each Defendant was but an instrumentality or conduit of the other in the prosecution of a single venture, namely the design, manufacture, promotion and sale of the M2a-Magnum Hip System and the M2a Magnum System. Therefore, it would be inequitable for either Defendant to escape liability for any obligation of the other.

13. In June of 2015, BIOMET, INC, was purchased by ZIMMER BIOMET HOLDINGS, INC., also having its world-wide corporate headquarters in Warsaw, Indiana. In June of 2015, Biomet Orthopedics, LLC, Biomet U.S. Reconstruction, LLC, and Biomet Manufacturing, LLC were wholly owned subsidiaries of Biomet, Inc. In June of 2015, the parent company of BIOMET, INC, LVB ACQUISITION, Inc., was purchased by ZIMMER HOLDINGS, INC, which also had its world-wide corporate headquarters in

Warsaw, Indiana.  The 2014 Annual Report issued by Zimmer Holdings, Inc. indicated that "on April 24, 2014, we entered into a definitive agreement to merge with LVB Acquisition, Inc., the parent company of Biomet, Inc. in a cash and stock transaction valued at approximately $13.35 billion . . . . . In connection with the Biomet merger, we will pay off all of LVB's outstanding funded debt . . . The merger will position the combined company as a leader in the $45 billion musculoskeletal industry."  The 2014 Annual Report also infers that after the merger, the activities of Biomet, Inc. would be synergized with those of Zimmer Holdings, Inc. (including Zimmer, Inc.).   Simultaneous with the June 2015 merger, Zimmer Holdings, Inc. changed its name to Zimmer Biomet Holdings, Inc.  and thereafter, subsidiaries of the new Zimmer Biomet Holdings, Inc. took on the trade name and began doing business as "Zimmer Biomet."   According to the 2015 Annual Report, by the last half of 2015 significant progress at integration of Biomet, Inc. and Zimmer Biomet Holding, Inc. had been accomplished by integrating global sales leaders, operating synergies, products, research and development.  The 2015 Annual report indicates that Zimmer Biomet Holdings, Inc.'s sales had increased by 28.3 percent due to the merger. In a 2016 response to the FDA, David Kunz, Senior Vice President, Global Quality, Regulatory & Clinical Affairs for Zimmer Biomet Holdings, Inc. told the FDA that after the merger was closed, Zimmer Biomet Corporate directed corporate quality audits, initiated a remediation program at the Warsaw North Campus (Biomet facility) and implemented Zimmer Biomet quality standards for the network as part of the Quality Excellence Plan.  Based on the public statements of Zimmer Biomet Holdings, Inc., from June 2015 to present, all activities of the subsidiary companies relating to the product at issue in this case were directed and controlled by ZIMMER BIOMET HOLDINGS, INC.

In Biomet's words, "Biomet is now Zimmer Biomet."[1]

14. Jurisdiction is proper in the courts of the State of Florida because Plaintiff is a citizen of Florida, all Defendants marketed, sold, and distributed the M2a product line in Florida, Plaintiff was injured by the M2a in Florida, and Plaintiff underwent a painful and invasive revision surgery in Florida.

15. Venue is proper in United States District Court for the Middle District of Florida Jacksonville Division in that pertinent facts, i.e. revision surgery, giving rise to this suit occurred in City of Jacksonville, County of Duval, which is located in the Middle District of Florida Jacksonville Division.

16. Suit is brought on behalf of Plaintiff for damages in excess of $75,000.

## STATEMENT OF FACTS

### A. The Biomet M2a is different than the typical hip replacement

1. A hip replacement surgery replaces the natural head and socket of the hip joint with artificial components.

2. The majority of hip replacements implanted world-wide over the past several decades have utilized a replacement hip joint consisting of a metal head making contact with an ultra-heavy-duty plastic cup inside a metal shell.

3. This typical hip replacement consisting of a metal-plastic interface has been refined to the point that ultra-heavy-duty plastic hip replacements have a greater than 99.5 percent success rate per year.

4. The Biomet M2a instead uses a metal replacement head interfacing directly with a

---

[1] *See*, legacy Biomet homepage at:
http://www.biomet.com/wps/portal/internet/globalLocations/!ut/p/a1/04_Sj9CPykssy0xPLMnMz0vMAfGjzOL9HA1cDZxMjLwsjI0sDBzNDNxDLXxMDYx8jIAKIoEKDHAARwNC-sP1o8BK8JhQkBthkO6oqAgA_JVfXA!!/);
(Last accessed Nov. 6, 2019).

metal shell; there is no plastic liner in the M2a. Accordingly, this type of hip system is commonly referred to as a metal on metal hip replacement.

**B.   Metal on metal hip replacements were tried decades ago and abandoned**

1. In the 1960s and early 1970s, hip replacement manufacturers first began to market metal on metal hip replacements to surgeons.

2. Unfortunately, these early metal on metal hip replacements experienced a high rate of heavy metal poisoning and failure.

3. When the metal shell and metal head of these implants rubbed together, they released toxic cobalt and chromium debris into the body.

4. The cobalt and chromium debris resulted in patients suffering heavy metal poisoning, causing tissue death.

5. As a result, the medical community abandoned metal on metal hip replacements in the 1970s.

**C.   Biomet and the Design Surgeon revived abandoned metal on metal hip replacements with M2a**

1. Despite the prior failure of metal on metal hip replacements to perform as intended, Biomet and the Design Surgeon entered into an agreement to begin designing metal on metal hip replacements in the 1990s.

2. As a result of this collaboration, the M2a hip replacement was created and began being sold in the United States in 2001.

**D.   Biomet and the Design Surgeon employed a loophole to avoid testing M2a**

1. Despite their knowledge that early metal on metal hip replacements were a failure and resulted in heavy metal poisoning, Biomet and the Design Surgeon conducted extremely limited testing of the M2a before selling it for implantation into the bodies

6

of patients.

2. To avoid comprehensive testing of the M2a hip replacement, Biomet claimed to United States regulators that the M2a should be "grandfathered-in" because it was substantially similar to hip replacements sold prior to May 28, 1976. [2]

3. This loophole required no testing for safety or efficacy.

**E.  Defendants claimed that the M2a was a "lifetime hip" and suitable for use in younger, more active patients**

1. Defendants claimed that without the plastic liner to wear out, the Biomet M2a should last a patient's lifetime.

2. Defendants claimed that the Biomet M2a was suitable for implantation in younger, more active patients.

3. Defendants promoted the M2a as a "lifetime hip."

4. Defendants represented that the expected useful safe life of the M2a was well in excess of 20 years.

**F.  Defendants Fraudulently Misrepresented to The Public by Marketing The M2a As Having "Low Wear"**

1. The M2a produces an exponentially larger number of smaller and more toxic wear particles than wear particles produced from plastic hip implants.

2. Biomet had actual knowledge by 2000 that heavy metal poisoning is related to the size and total number of these metal particles as opposed to the total weight of released metal particles.  Further, Defendants had actual knowledge that these particles are toxic.

3. Plastic wear particles released from polyethylene implants are much larger and less reactive than heavy metal wear from metal on metal implants.  Testing protocols for

---

[2] *See,* https://www.accessdata.fda.gov/cdrh_docs/pdf4/K042037.pdf containing Biomet Manufacturing Corp.'s 510(k) Summary of Safety and Effectiveness (Last accessed Nov. 6, 2019).

wear in polyethylene implants allows for measurement of the wear by total weight.

4.  These same protocols, however, *explicitly* warn against the use of the protocols for measuring wear in metal on metal implants, like the M2a.  This is, in large part, because the toxicity and reactivity of heavy metal wear is not related to weight, but particle size and count.

5.  Biomet knowingly and intentionally conducted laboratory "wear testing" for the M2a in a way that was *only* designed for testing of plastic hip implants.  Particularly, the test protocols only measured wear by total weight.

6.  Biomet was fully aware that the M2a produced more toxic wear than polyethylene implants, regardless of total weight comparisons.

7.  Despite the aforementioned knowledge, Biomet knowingly and intentionally marketed the M2a by claiming that it produced less wear than polyethylene (plastic) hip replacements.  Furthermore, Biomet knowingly and intentionally marketed the M2a by falsely associating its deceptively marketed "low wear" properties with safety and efficacy.[3][4]

8.  Defendants provided this false information about the M2a having lower wear to Plaintiff's orthopedic surgeon prior to implant Plaintiff's M2a hip.

9.  Plaintiff's surgeon relied on this false information in deciding to use the M2a Hip installed in Plaintiff.

---

[3] *See,* http://www.biomet.com/wps/wcm/connect/internet/acb6d5c6-e3e9-42e2-b3e6-83fd38a567f1/Y-BMT-735_021502_K.pdf?MOD=AJPERES, (Last accessed Nov. 6, 2019).
[4] *See,* http://www.biomet.com/campaign/trueAlternativeBearings/BOI03400MagnumDesignRationale.pdf (Last accessed Nov. 6, 2019).

### G.  Defendants Suppressed Reports of Problems with The M2a And Deceived Surgeons into Believing That Concerns About Heavy Metal Poisoning Were False

1. Defendants knowingly and intentionally spread false information claiming that decades of experience with previous metal on metal implants purportedly resulted in zero instances of heavy metal poisoning.[5]

2. Defendants engaged in a knowing and intentional scheme to hide clinical information relating to heavy metal poisoning from its own metal on metal hip replacements.

3. This scheme included explicit training to Biomet's sales representatives on how to deceptively convince surgeons that reports of heavy metal poisoning were all fake; merely a theoretical concern; and a scheme by competitors who do not sell metal on metal hip replacements to steal business.

4. The information that the Biomet Defendants provided about Biomet hip replacement systems far exceeded the information provided on M2a packaging or labeling.

5. At all times relevant to this Complaint, Plaintiff's surgeon relied upon information provided by the Biomet Defendants in selecting the M2a hip replacement for implantation into Plaintiff's body.

6. Prior to initial implantation, Plaintiff, Russell Hanson was informed by his surgeon that the M2a hip implant was the best product available on the market; that given their age at the time of implant, a MoM implant would be best given its longevity compared to other articulations, and that such longevity could be up to a lifetime of the patient. Plaintiff relied upon their doctor's knowledge and expertise in moving forward with implantation of the M2a. Had Plaintiff known of the issues regarding M2a hips discussed herein,

---

[5] *See* http://www.grossortho.com/images/stories/pdf/currenttopics/MetalIonWhitePaper.pdf.  (Last accessed Nov. 6, 2019).

Plaintiff would not have proceeded with implantation of the M2a product.

7. Biomet Defendants, due to their sales representatives' role in the sale of particular implant components to orthopedic surgeons, have notice of every surgery in which Biomet components are implanted. This includes surgeries in which Biomet components are used to replace failed M2a implants. As a result, Biomet Defendants possess a unique set of clinical information through which the success or failure of their implants can be analyzed.

8. Unfortunately, Biomet Defendants engaged in a corporate practice of under reporting and failing to properly analyze clinical information in their possession regarding implants which they sell.

9. In 2016 and 2018 this practice resulted in multiple "483" observations by the FDA regarding Biomet Defendants' failure to properly handle complaint reports and failure to properly analyze clinical information regarding product failures. Zimmer Biomet was aware of these observations and responded to the FDA on Zimmer Biomet letterhead.

10. Biomet Defendants also marketed their metal on metal hip replacements based upon what it claimed was a low "reported adverse event rate" of ".056". However, Biomet Defendants were intentionally and knowingly failing to include large numbers of adverse events, especially those relating to heavy metal poisoning. Biomet was fully aware that this scheme artificially suppressed the "reported adverse event rate." Regardless, Biomet consistently used the figure in its marketing. Biomet was aware that this figure would be heavily relied upon by the medical community.

H. **Biomet falsely claimed it conducted extensive testing of M2a**

1. Despite the fact that Biomet conducted no clinical testing of the M2a hip replacement,

it has continuously claimed "[t]he M2a-Magnum™ Large Metal Articulation System offers optimal joint mechanic restoration and ultra-low-wear rates in vivo" citing to a 1996 article about previously abandoned types of metal on metal hip replacements.[6]

2. Biomet also stated that "once the manufacturing process is complete, *all* M2a-Magnum components undergo a thorough inspection process to ensure precise manufacturing tolerances have been achieved. Major dimensions such as sphericity (roundness) *and* roughness are verified using non-contacting light interferometry through the use of ZygoPCI Laser. The M2a-Magnum™ articulation is manufactured to a 5 micron deviation, compared to the ISO standard of 10 microns. Roughness (Ra value) is a measure of the texture of a surface quantified by vertical deviations. All M2a-Magnum™ components are tested to ensure that the Ra value does not exceed .005 microns. **These key measurements are necessary to maintain low wear and optimal clearance** found in M2a-Magnum™ components." (Internal cross references omitted; emphasis added).[7]

3. However, when forced to confront these claims, Biomet Staff Engineer, Malcolm Naylor, issued a public declaration on November 1, 2019 admitting the untruthfulness of those claims: "Biomet did not use the Zygo to test and/or the M2a cups and heads for surface finish measurements, not to ensure that the M2a cups and heads met the surface finish specification designed and/or adopted by Biomet for the M2a cups and heads."

4. In a 2004 publication titled "Metal Ions – A Scientific Review," Biomet falsely concludes that: "Extensive research and years of clinical trials have failed to prove any

---

[6] *See*, http://www.biomet.com/campaign/trueAlternativeBearings/BOI03400MagnumDesignRationale.pdf (Last accessed Nov. 6, 2019).
[7] *Id.*

cause for concern associated with the ion levels exhibited from metal-on-metal implants."[8]

5. In fact, in a heading on page 7 of the publication, Biomet goes so far as to claim that: "Cobalt and Chromium may be beneficial to the body as established by research and listed by the US government."[9]

6. The 2004 publication by "Biomet Orthopedics, Inc., the Most Responsive Company in Orthopedics," is still available to orthopedic surgeons and the public online today at http://www.grossortho.com/images/stories/pdf/currenttopics/MetalIonWhitePaper.pdf (Last accessed November 6, 2019).

## I. The Design Surgeon conducted secret M2a marketing campaign in exchange for millions of dollars

1. In conjunction with the promotion of the M2a hip replacement, the one of the Biomet Defendant's "design surgeons," gave speeches and published articles such as "The Rationale for Metal-on-Metal Total Hip Arthroplasty" published in 2005, claiming that there were "no adverse physiologic effects" to metal on metal hip replacements.

2. At the time that the design surgeon published the above article, Biomet was paying the design surgeon a percentage of the sale price of M2a metal on metal hip replacement systems sold in the United States, something the design surgeon failed to mention in the article promoting such hip replacements.

3. Pursuant to a Deferred Prosecution Agreement with the Department of Justice, in 2008, Biomet made public that the design surgeon received payments from Biomet of between $3.0 and $3.1 million dollars in just the previous year. Extrapolating the

---

[8] *See* http://www.grossortho.com/images/stories/pdf/currenttopics/MetalIonWhitePaper.pdf. (Last accessed Nov. 6, 2019).
[9] *Id.*

one year that Biomet's payments to the design surgeon are publicly available, leads to the conclusion that the Design Surgeon has received tens of millions of dollars from Biomet

**J.   Thousands of M2a hip replacements are implanted in Florida and Ohio citizens**

1. Defendants' promotion of the M2a hip replacement was extremely successful.

2. In both Florida and Ohio alone, thousands of M2a metal on metal hip replacements were sold by Defendants and surgically implanted into the bodies of patients.

3. These hip replacements implanted in Florida and Ohio citizens were designed by Biomet; promoted by Biomet; sold by Biomet; and implantation and follow-up instruction were provided to surgeons by Biomet.

**K.   Zimmer Biomet Defendants continue to claim that the M2a is safe and successful**

1. Biomet Defendants sold M2a hip replacements for implantation into the bodies of patients up to the year 2014 or 2015.

2. Biomet Defendants ceased selling Biomet M2a metal on metal hip replacement in 2014 or 2015.

3. However, Zimmer Biomet Defendants have continued to reassure surgeons and the public that the heavy metal poisoning seen with other metal on metal hip replacements is not an issue with the M2a.

4. To this day, Zimmer Biomet Defendants continue to claim to orthopedic surgeons and the public that the M2a is a safe and successful product.

**L.   In 2010 Johnson & Johnson voluntarily recalled almost identical hip replacement**

1. Approximately the same time as Defendants began selling the M2a, Johnson & Johnson began selling the DePuy ASR.

2. The DePuy ASR was almost identical to the M2a in its primary design features.

3. Like the M2a, the DePuy ASR was a monoblock metal on metal hip replacement system with its cobalt chromium alloy head articulating against its cobalt chromium alloy shell.

4. In the summer of 2010, in response to "higher than expected revision rates," Johnson & Johnson conducted a world-wide recall of the DePuy ASR hip replacement.

5. Johnson & Johnson advised surgeons to conduct detailed testing and follow-up of patients with DePuy ASR hip replacements.

6. As a result of the testing and follow-up, dangerously high heavy metal levels were discovered in a significant percentage of patients necessitating surgery to remove the metal on metal hip replacements.

7. Heavy metal poisoning and tissue death from the toxic heavy metals released by the ASR was widely reported in the medical literature.

8. The Defendants were aware of the reports and studies discussing the injuries suffered by metal on metal patients as a result of this very similar product.

**M. Defendants' response to the recall of the almost identical product: Sell more M2as!**

1. In response to the 2010 voluntary world-wide recall of an almost identical hip replacement, Defendants did not:

    a. Recall Defendants' almost identical M2a hip replacement.

    b. Suspend sales of their almost identical hip replacement pending a full investigation.

    c. Conduct comprehensive testing of the M2a to ensure it was not prone to causing heavy metal poisoning.

    d. Warn surgeons of the design similarities and the need to inform and carefully follow-up their patients.

2. Instead, Defendants increased promotion of M2a, attempting to capture market share

lost by Johnson & Johnson due to its voluntary recall.

3. Defendants devised marketing strategies to differentiate the M2a from the recalled ASR hip replacement and other metal on metal hip replacements.

4. Defendants promoted these marketing strategies to surgeons and the public to reassure them that the M2a did not cause heavy metal poisoning.

**N.** **In 2010, Netherlands hospital warns Biomet of high rate of pseudotumors with M2a**

1. At the same time that Defendants were reassuring orthopedic surgeons and the public of the safety of the M2a, they were receiving reports of just the opposite.

2. Isala Klinieken ("Isala") located in Zwolle, The Netherlands, has historically had a long and close relationship with Biomet.

3. Isala was in fact a Biomet funded study site.

4. Prior to 2007, Isala implanted patients with Biomet M2a metal on metal hip replacements.

5. In 2010, Isala reported to Biomet that when it performed CT scans of over 100 patients' hips, more than a third had pseudotumors adjacent to the M2a hip replacement.

**O.** **Biomet was warned that CT/MRI scanning was necessary to see tissue death from M2a heavy metal poisoning**

1. Isala reported to Biomet that the necessity for revision surgery was not identified until Isala conducted the CT scanning of their M2a patients.

2. Isala warned that by the time that swelling, pain, and clicking indicating tissue death resulting from the heavy metal poisoning became apparent, the patient may have already suffered extensive injury.

3. In 2010, Isala informed Biomet that it had ceased implanting Biomet M2a hip replacements in its patients.

4. Isala encouraged Biomet to adopt a comprehensive screening protocol using CT and MRIs of all patients with Biomet M2as implanted in their bodies and warned that without such an enhanced protocol, patients may be at risk.

5. The Isala Klinieken reported some of its finding regarding the M2a in a British medical journal.[10]

6. Despite all of these critical warnings provided by the Isala Klinieken, Defendants failed to inform surgeons or patients of the study, ignored the need for follow-up screening, and instead continued to promote the M2a for implantation into the bodies of patients.

**P.** **Finland University reports severe adverse reactions from M2a heavy metal debris**

1. Likewise, Turku University in Turku, Finland has historically had a long and close relationship with Biomet.

2. Like Isala, Turku University was a Biomet funded study site.

3. From 2005 to 2012, the Biomet M2a metal on metal hip replacement was the most commonly implanted hip replacement at Turku University.

4. In 2013, Turku University reported to Biomet that when the University examined a sample of their patients implanted with the M2a, over half of the patients were experiencing ARMD or "Adverse Reaction to Metal Debris" from the M2a.

5. MRIs of the sample of Turku University M2a patients revealed that over half had a psuedotumor or fluid collection in their hip.

6. Despite its long and close relationship with Biomet, in a 2013 publication of the Nordic Orthopedic Federation, Turku University stated that "ARMD is common after … M2a

---

[10] Bosker B, Ettema H, Boomsma M, et al. High incidence of pseudotumour formation after large-diameter metal-on-metal total hip replacement: a prospective cohort study. *J Bone Joint Surg Br.* 2012 Jun;94(6):755-61.

total hip arthroplasty, and we discourage the use of this device."[11]

7.  Defendants failed to inform surgeons or patients of this study, that Turku University had discouraged use of the M2a, the need for surgeons to screen their patients for Adverse Reaction to Metal Debris, and instead continued to promote the M2a for implantation into the bodies of patients.

**Q.  Biomet used Olympic gymnast Mary Lou Retton as M2a spokesperson**

1.  As part of the promotion of the M2a hip replacement, Biomet hired Olympic gold-medal gymnast, Mary Lou Retton, as a spokesperson.

2.  Mary Lou Retton had received a M2a hip replacement in the mid-2000's.

3.  Biomet heavily promoted to surgeons and the public that the M2a hip allowed "younger, more active patients, like Mary Lou" to "return to her normal activities, including her workout schedule."[12]

4.  Mary Lou Retton was used by Defendants to promote the M2a in brochures, in newspapers, on radio and television, and in-person to orthopedic surgeons and the public. [13]

5.  A heading on Biomet's website proclaims, "Mary Lou lives pain-free, and so should you."[14]

**R.  Mary Lou Retton has sued Biomet over defective M2a hip replacement**

1.  Unfortunately, Mary Lou Retton, like the Plaintiff in this action, is a M2a victim.

---

[11] Mokka J, Junnila M, Seppänen M, et al. Adverse reaction to metal debris after ReCap-MAGNUM-Magnum large-diameter-head metal-on-metal total hip arthroplasty. *Acta Orthopaedica*. 2013;84(6):549-554.
[12] *See*, http://www.biomet.com/fileLibrary/Patient_Education/PatientEdBrochures/Hip/English/Mary%20Lou%20Retton%20-%20Magnum%20Magnum.pdf (Last accessed Nov. 6, 2019).
[13] *See*, http://www.biomet.com/news/getFile.cfm?id=113&rt=inline&type=pr (Last accessed Nov. 6, 2019).
[14] *See*, http://www.biomet.com/fileLibrary/Patient_Education/PatientEdBrochures/Hip/English/Mary%20Lou%20Retton%20-%20Magnum%20Magnum.pdf (Last accessed Nov. 6, 2019).

2. While initially "pain-free," Mary Lou Retton suffered heavy metal poisoning from the M2a hip replacement necessitating the surgical removal and replacement of the metal on metal hip replacement.

3. Mary Lou Retton was so severely injured by the M2a metal on metal hip replacement, that despite her status as a celebrity spokesperson for the product, she too sued the company.

**S.** **Despite knowing of the failure of the M2a in Mary Lou Retton for years, Zimmer Biomet continues to claim her a success story**

1. Zimmer Biomet has failed to inform surgeons and the public that Mary Lou Retton suffered heavy metal poisoning and had to have her M2a surgically removed.

2. Zimmer Biomet continues to cite to Mary Lou Retton as a patient success story.

3. Zimmer Biomet has known of the failure of Mary Lou Retton's hip replacement for years but has continued to promote to surgeons and the public a false story.

**T.** **Australian government required Biomet to recall M2a**

1. Australia has a world-leading implant registry which keeps track of every orthopedic hip replacement sold, implanted, and replaced in Australia.

2. Biomet ceased selling the M2a in Australia in 2011.

3. In 2014, the Australian government communicated to Biomet that it was seeing excessive failure rates of the M2a in Australian patients.

4. In 2015, Biomet, "in consultation with" the Australian government issued a "Hazard Alert" recalling the Biomet M2a due to a "higher than expected revision rate."

5. Because Biomet had already ceased selling the M2a in Australia, the Australian government's recall of the M2a consisted of the "Hazard Alert" and mandating Biomet notify implanting surgeons in Australia of the recall and excessive revision rate.

6. On information and belief, Zimmer Holdings, Inc. was conducting due diligence in its merger with Biomet, Inc. on or about the time that the Australian Hazard Alert was issued.

7. On information and belief, Zimmer Holdings, Inc. was aware of the Australian Hazard Alert prior to the completion of the merger with Biomet, Inc.

8. Zimmer Biomet Defendants, including Zimmer Biomet Holdings, Inc., have failed to disclose to orthopedic surgeons or the public that the M2a hip replacement was recalled in Australia and that the Australian government issued a "Hazard Alert" regarding the M2a.

## U. **Zimmer Biomet Defendants recalled M2a in various European Union countries**

1. Biomet Defendants ceased selling the M2a implants in Europe in December 2012.

2. In 2016, Zimmer Biomet Defendants, after discussion with regulatory agencies, issued a Field Safety Corrective Action based on "data collected by the National Joint Register (NJR) for England, Wales and Northern Ireland which revealed that this hip system has a higher than expected revision rate."

3. Because Biomet had already ceased selling the M2a in Europe, the recall consisted of the "Urgent Field Safety Notice" and notification to implanting surgeons of the recall, the excessive revision rate, and guidance for patient follow up.

4. Zimmer Biomet Defendants have failed to disclose to orthopedic physicians or the public that the M2a hip replacement had been recalled in Europe and that the a "Urgent Field Safety Notice" was issued in various European countries.

### V.  Since 2012 Biomet has had false M2a failure rate data posted on its website

1. From 2012 until today, Biomet had posted on its website under the heading "Important information regarding metal-on-metal hips" data purporting to show the success of Biomet's metal on metal hip replacements at http://www.biomet.com/wps/portal/internet/Biomet/Healthcare-Professionals/products/orthopedics/important-information-mom-hips (Last accessed November 6, 2019.).

2. The "Important information regarding metal-on-metal hips" is clearly intended to reassure patients and surgeons that Biomet's metal on metal hip replacements are safe and performing as intended.

3. The "Important information regarding metal-on-metal hips" states "Biomet has been closely monitoring the available data regarding its [metal on metal] hip devices."

4. The "Important information regarding metal-on-metal hips" claims that there is no statistically significant difference between survivorship of the Biomet Magnum and the Biomet M2a-38 and hip replacements generally in the Australian National Joint Registry and the England and Wales National Joint Registry.

5. By 2015, at the latest, Biomet was aware, and on information and belief Zimmer Biomet Holdings was aware, that the Biomet Magnum and M2a-38 were failing at a statically significantly higher rate than hip replacements generally in the Australian National Joint Registry.

6. Likewise, for years Biomet has been aware that the Magnum and M2a-38 were failing at a significantly significant higher rate in the England and Wales National Joint Registry than hip replacements generally.

7. Despite knowing that it would mislead orthopedic surgeons and the public concerning the safety of its metal on metal hip replacements, Biomet has continued to promote false information regarding the safety of its M2a hip replacement.

**W. Biomet, Inc. and Zimmer Holdings, Inc. Conspired to Conceal and Suppress Clinical Data of Safety and Effectiveness Regarding the M2a In Order to Facilitate the Merger Creating Zimmer Biomet Holdings, Inc.**

1. In June of 2015, the parent company of Biomet, Inc., LVB Acquisition Inc., was purchased by Zimmer Holdings, Inc.

2. The two companies were combined to capitalize on the opportunity to create a new company that comprised the best of both Zimmer and Biomet and to be able to bring the two world class companies together and cement Warsaw, Indiana as the musculoskeletal innovation capital of the world.

3. Zimmer Holdings, Inc., changed its name to Zimmer Biomet Holdings, Inc., the trade name "Zimmer Biomet" was created, a new logo was created and the combined company began trading on the stock market as "ZBH."  (At the time Biomet's parent company was not actively trading on the public market and withdrew its application for IPO.)

    a. The trade name "Zimmer Biomet" and the new logo,  according to David Dvorak, the CEO of Zimmer Biomet, was designed to utilize the visual components of both the legacy Zimmer and Biomet brands.  The company logo combined Zimmer's iconic symbol with elements of Biomet's corporate identity.

4. On information and belief, during due diligence associated to the merger Zimmer Holdings, Inc. was aware of the 2014 Australian recall of M2a products. *See* § T *supra.*

5. On information and belief, during due diligence associated to the merger Zimmer Holdings, Inc. was aware of problems associated with quality control, complaint reporting, and manufacturing problems at Biomet, Inc. facilities located in Warsaw, IN.

6. On information and belief, in an effort to complete the merger, both Biomet, Inc., and Zimmer Holdings, Inc. suppressed the above referenced information regarding problems associated to M2a products, quality control, complaint reporting, and manufacturing problems at legacy Biomet, Inc. facilities located in Warsaw, IN.

7. Further, Zimmer Biomet Holdings, Inc. was aware of the 2016 M2a "Urgent Field Safety Notice" issued in various European countries. The "Urgent Field Safety Notice" was issued by Zimmer Biomet. *See* § U *supra.*

8. Zimmer Biomet Holdings, Inc. was also aware of the FDA's 483 observations, and Zimmer Biomet responded to the FDA in December 2016. *See* § G *supra.*

9. Zimmer Biomet Holdings, Inc., after the merger likewise audited various of its own facilities and corporate practices and found, among other issues, problems related to complaint reporting, quality control, and manufacture of M2a products.

10. On December 2, 2016 a shareholder lawsuit was filed against Zimmer Biomet Holdings, Inc., alleging that Zimmer Biomet Holdings, Inc. failed to disclose supply chain problems that led to a decrease in order fulfillment rates, including within its hip portfolio. The lawsuit also alleges that statements about Zimmer Biomet Holdings' business operations and prospects were false, misleading, and/or lacked a reasonable basis. This suit is directly related to the systemic issues discovered during Zimmer Holdings, Inc.'s due diligence and the FDA's observations regarding the legacy Biomet Warsaw North campus.

11. Despite knowledge of the forgoing problems regarding M2a products, Zimmer Biomet Defendants failed to warn the U.S. public of M2a failures and recalls and continue to suppress reports of this information.

## X. The Biomet metal on metal hips are a ticking time-bomb implanted in thousands of Florida and Ohio citizens' bodies

1. The Biomet M2a is inherently defective.

2. When implanted in patients, it is prone to release toxic levels of cobalt and chromium.

3. Patients thus can suffer injury including but not limited to: heavy metal poisoning, elevated levels of cobalt and chromium in the blood, pseudotumors, tissue necrosis, osteolysis, muscle wasting, cold-welding, loosening of the acetabular component, delamination of the acetabular component, corrosion related injury, and other severe injuries.

4. All Defendants are continuing to fail to warn surgeons and patients that the M2a metal on metal hip replacements that were surgically implanted in patients' bodies may be releasing toxic heavy metals has left thousands of patients with ticking time-bombs in their hips.

5. Based on the studies discussed above and others, hundreds, if not thousands, of patients have already suffered undiagnosed pseudotumors, tissue death, bone death, etc. as a result of poisoning from the toxic heavy metals released from the M2a.

## Y. Florida and Ohio are facig a public health disaster from unmonitored M2as

1. As a result of Defendants' failure to warn surgeons and patients of the necessity for immediate testing and screening of implanted M2a hip replacements, the number of patients poisoned and severely injured by the M2a will greatly increase.

2. The States of Florida and Ohio are facing a public health disaster from unmonitored

M2a metal on metal hip replacements.

**Z.** **Plaintiff suffered heavy metal poisoning from M2a**

1. The Plaintiff was implanted with the M2a hip replacement and suffered heavy metal poisoning, tissue death, bone loss, and pain.

2. As a result of the heavy metal poisoning by the Biomet M2a, Plaintiff had to undergo an additional surgical procedure to surgically remove the defective hip replacement and replace it with one with a heavy-duty plastic liner.

3. Plaintiff then had to undergo an extensive recovery and rehabilitation.

4. As a result, Plaintiff lost mobility, needlessly suffered severe pain, was forced to undergo unnecessary revision surgeries, surgical trauma, and extensive rehabilitation.

**AA.** **Russell Hanson underwent a painful revision surgery for their failed left total hip arthroplasty**

1. Russell Hanson was implanted with the M2a Magnum system into their left hip in April 2007.  Plaintiff was 38 years old at the time and looked forward to continuing an active lifestyle.

2. Before the surgery, Russell Hanson met with Plaintiff's surgeon.  During the pre-surgical discussion, Plaintiff's surgeon recommended the M2a metal-on-metal bearing technology, relying on Biomet's representations that the product featured superior longevity and reduced wear.   During the meeting, Plaintiff's surgeon indicated that the Biomet metal-on-metal product was ideal for Plaintiff because it would not wear out and it was not likely there would be a need to undergo a second surgery later in life.   As a result, Plaintiff chose the Biomet product.

3. Russell Hanson was not aware that the Biomet product had not been clinically tested for safety and efficacy by Biomet before being released to the market.

4. Russell Hanson was not informed about the surprising lack of clinical awareness regarding the risks of metal ion wear presented by the Biomet metal-on-metal product.

5. Russell Hanson was not aware of the serious concerns raised by those responsible for understanding the clinical safety of metal-on-metal bearings, including the unresolved concerns raised by members of the August 2001 FDA panel responsible for the pre-clinical review of metal-on-metal hip products.

6. Russell Hanson was not aware that Biomet had entered into unethical financial arrangements for the promotion of metal-on-metal hip implants, leading to criminal charges and, eventually, Deferred Prosecution Agreements.

7. Russell Hanson was not aware of serious breakdowns in Biomet's adverse event reporting systems, which were necessary to accurately track the safety and performance of the Magnum product.

8. Plaintiff's surgeon, Dr. Douglas Chonko implanted Russell Hanson left Biomet hip products in excellent position, performing the surgery at Cuyahoga Falls General Hospital (now Western Reserve Hospital) in Cuyahoga Falls, Ohio.

9. Despite Plaintiff's surgeon's excellent positioning of the M2a products, Russell Hanson later developed problems associated with metallosis.

10. On November 12, 2020, Dr. Carl Freeman surgically removed and replaced the failed left M2a hip product, duet to metallosis from the metal prosthesis. Upon surgically opening Russell Hanson hip area, Plaintiff's surgeon tissue and synovium staining and encountered corrosive "cold-welding."

11. Plaintiff was not aware and could not, with the exercise of reasonable diligence, have

discovered he was injured, that the M2a implanted into him was defective, and/or that he was injured by the defective M2a implanted into him until November 12, 2020.

12. Dr. Freeman removed the entire Biomet M2a metal-on-metal prosthesis and articulating construct, except for the femoral component, and replaced it with an alternative non-metal-on-metal construct.

13. Russell Hanson has undergone a long and painful recovery and rehabilitation from the surgical revision of the failed left Biomet M2a hip implant which has affected his quality of life.

## DAMAGES AND CAUSES OF ACTION

1. As a direct and proximate result of the defective M2a hip replacement, Plaintiff suffered injuries, including but not limited to economic injury, significant pain, tissue destruction, metal wear, metal poisoning, loss of enjoyment of life, and limitation of daily activities.

2. Plaintiff expects to continue suffering such injuries in the future as a result of the injuries received from the M2a.

3. As a direct and proximate result of the defective M2a, Plaintiff incurred medical expenses and expects to incur additional medical expenses in the future.

4. As a direct and proximate result of the defective M2a, Plaintiff incurred lost earning potential, income and earnings.

5. As a direct and proximate result of the defective M2a, Plaintiff experienced emotional trauma and distress and is likely to experience emotional trauma and distress in the future.

## FIRST CAUSE OF ACTION
## FRAUD AGAINST ZIMMER BIOMET DEFENDANTS

1. Plaintiffs incorporates by reference Paragraphs 1 through 169 as though set forth fully herein.

2. Prior to the implantation of the M2a products in Plaintiff's body, and continuing thereafter, Biomet Defendants knowingly and intentionally undertook an inadequate testing protocol and false marketing scheme which made misrepresentations and omissions in order to profit from the unproven promise of the theoretical advantages associated with metal on metal hip replacements; said misrepresentations are previously set forth in greater detail herein, including but not limited to Sections D, E, F, G, H, I, J, K, L, M, S, V, W.

3. Prior to the implantation of the M2a products in Plaintiff's body, and continuing thereafter, Biomet Defendants knowingly and intentionally engaged in a false marketing scheme which made misrepresentations and omissions to alter the orthopedic community's understanding of the clinical history of failure with previous generations of metal on metal hip replacements; said misrepresentations are previously set forth in greater detail herein, including but not limited to Sections D, E, F, G, H, I, J, K, L, M, S, V, W.

4. Following the release of Biomet's M2a system, prior to implantation of the M2a products in Plaintiff's body, and during the time Plaintiff was implanted with Biomet's M2a system, Biomet Defendants engaged in a knowing and intentional scheme to make misrepresentations and omissions to hide clinical information relating to heavy metal poisoning from its metal on metal hip replacements.

5.   Further, in support of these Fraud allegations, the

Plaintiffs plead as follows:

a.   Biomet Defendants were warned in 1995 that their testing protocols ignored known dangers of metal on metal implants, yet moved forward with insufficient testing, anyway.

b.   Biomet Defendants conducted laboratory testing for plastic hip implants and knew such testing was not appropriate for metal on metal hip implants.

c.   Biomet Defendants knew that metal ions and particles released from the M2a are smaller, higher in number, and more toxic than plastic particles released from plastic implants.

d.   Biomet Defendants marketed the M2a as having less volumetric wear than plastic hip implants, knowing it would mislead the orthopedic community into incorrectly believing that the M2a was safer and more effective.

e.   Biomet Defendants engaged in a deceptive scheme to train sales representatives to convince the medical community that concerns over clinical risks due to metal wear are fake.

f.   Biomet Defendants engaged in a corporate-wide abuse of legal privilege to hide internal documents regarding metal on metal data.

g.   Biomet Defendants knowingly and intentionally underreported product failures.

h.   Biomet Defendants knowingly and intentionally failed to properly analyze clinical information in order to suppress concern about the M2a's track record.

i.   Biomet Defendants knowingly marketed a "reported adverse event rate" it knew would be relied upon by the orthopedic community and which it knew to be false based on its own deceptive scheme to suppress such rate.

j.   Biomet Defendants shirked the scientific method in clinical tests by either designing the tests in order to elicit an intended result or by altering the data or input criteria, or by simply disregarding damaging results under the arbitrary decision that such results are "outliers" not indicative of actual performance.

k.   Biomet Defendants falsely claimed "clinically proven results" in M2a products upon launch, despite never conducting a single pre-market clinical test.

l.   Biomet Defendants falsely claimed that the M2a system "offers optimal joint mechanic restoration and ultra-low-wear rates in vivo" despite citing to a 1996 article about previously abandoned types of metal on metal hip replacements.

m.  Despite knowing that published medical literature explicitly discussed adverse physiologic effects related to heavy metal wear from metal on metal hip implants, Biomet Defendants falsely claimed in marketing that extensive experience with metal on metal implants "failed to prove any cause for concern" with its M2a implants.

n.  Biomet Defendants falsely claimed in its marketing that "Cobalt and Chromium may be beneficial to the body" despite knowing that Cobalt and Chrome released from M2a implants are toxic.

o.  Biomet Defendants intentionally misrepresented the existence of concern over heavy metal wear in order to market and profit from the sale of M2a implants.

p.  Biomet Defendants deceptively engaged in marketing the M2a through the M2a design surgeon by not revealing their financial relationship in marketing literature, such as "The Rationale for Metal-on-Metal Total Hip Arthroplasty."

q.  Biomet Defendants failed to inform the orthopedic community in the United States regarding the Isala Clinic's finding of the need for advanced screening protocols in order to diagnose heavy metal poisoning in M2a patients; instead Biomet Defendants continued to heavily promote M2a products.

r.  Biomet Defendants failed to inform the orthopedic community in the United States regarding Turku University's finding of heavy metal poisoning in over half of the patients who received an M2a and of Turku University's warning claiming that they "discourage use of this device."

s.  Biomet Defendants failed to inform the public that the M2a posterchild, Mary Lou Retton, had both of her M2a implants fail due to heavy metal poisoning.

t.  Biomet Defendants continued to falsely claim Mrs. Retton as a "patient success story."

u.  Biomet Defendants failed to inform United States citizens and surgeons of the international recalls, hazard alerts, and safety notices related to its M2a.

6.  Biomet Defendants made these misrepresentations and omissions with the specific intent that Plaintiff and Plaintiff's orthopedic surgeon rely on such representations and omissions with intent to deceive the orthopedic community and profit from deceitfully convincing them to use metal on metal hip replacements again, particularly the M2a.

7.  The above representations and/or omissions were false.

8. Biomet Defendants knew that these statements were false at the time they were made, in that they had information in their possession and control directly contradicting the misrepresentations, or alternatively Biomet Defendants made these representations without knowing whether they were true or false.

9. Biomet Defendants made these statements for the purpose of inducing Plaintiff, Plaintiff's orthopedic surgeon, the orthopedic community, and consumers in need of a hip replacement, to act in reliance thereon to purchase the M2a products.

10. These representations were made to Plaintiff's orthopedic surgeon prior to installing the M2a in Plaintiff's body.

11. Plaintiff, and Plaintiff's orthopedic surgeon agent, acted in reliance on the correctness of Biomet's representations which resulted in injury to Plaintiff as described above, by deciding to use, install and purchase the M2a products based on the misrepresentations.

12. The above referenced reliance was reasonable under the circumstances.

13. The representations and omissions were material to Plaintiff's orthopedic surgeon in selecting the M2a products installed in Plaintiff.

14. The representations and omissions were material to Plaintiffs in selecting the M2a products.

15. As a direct and proximate result of the Biomet Defendants' fraudulent conduct, Plaintiffs suffered pecuniary loss, injury and damage as described herein.

## SECOND CAUSE OF ACTION
## FRAUDULENT CONCEALMENT AGAINST ZIMMER BIOMET DEFENDANTS

1. Plaintiffs incorporate by reference Paragraphs 1 through 184 as though set forth fully herein.

2.  Defendants had sole access to material facts concerning the dangers and unreasonable risks of the M2a.

3.  Biomet Defendants knowingly and willfully concealed material information with respect to the M2a in a manner to distort its safety record and falsely portray the system to the orthopedic community and public as safe and effective, which is evidenced by the following:

    a.  Biomet Defendants were warned in 1995 that their testing protocols ignored known dangers of metal on metal implants, yet moved forward with insufficient testing, anyway.

    b.  Biomet Defendants conducted laboratory testing for plastic hip implants and knew the testing procedure used for plastic hips was not appropriate for metal on metal hip implants.

    c.  Biomet Defendants knew that metal ions and particles released from the M2a are smaller, higher in number, and more toxic than plastic particles released from plastic implants.

    d.  Biomet Defendants marketed the M2a as having less volumetric wear than plastic hip implants, knowing it would mislead the orthopedic community into incorrectly believing that the M2a was safer and more effective.

    e.  Biomet Defendants engaged in a deceptive scheme to train sales representatives to convince the medical community that concerns over clinical risks due to metal wear are fake.

    f.  Biomet Defendants engaged in a corporate-wide abuse of legal privilege to hide internal documents regarding metal on metal data.

    g.  Biomet Defendants knowingly and intentionally underreported product failures.

    h.  Biomet Defendants knowingly and intentionally failed to properly analyze clinical information in order to suppress concern about the M2a's track record.

    i.  Biomet Defendants knowingly marketed a "reported adverse event rate" it knew would be relied upon by the orthopedic community and which it knew to be false based on its own deceptive scheme to suppress such rate.

    j.  Biomet Defendants shirked the scientific method in clinical tests by either designing the tests in order to elicit an intended result or by altering the data or

31

input criteria, or by simply disregarding damaging results under the arbitrary decision that such results are "outliers" not indicative of actual performance.

k.  Biomet Defendants falsely claimed "clinically proven results" in M2a products upon launch, despite never conducting a single pre-market clinical test.

l.  Biomet Defendants falsely claimed that the M2a system "offers optimal joint mechanic restoration and ultra-low-wear rates in vivo" despite citing to a 1996 article about previously abandoned types of metal on metal hip replacements.

m.  Despite knowing that published medical literature explicitly discussed adverse physiologic effects related to heavy metal wear from metal on metal hip implants, Biomet Defendants falsely claimed in marketing that extensive experience with metal on metal implants "failed to prove any cause for concern" with its M2a implants.

n.  Biomet Defendants falsely claimed in its marketing that "Cobalt and Chromium may be beneficial to the body" despite knowing that Cobalt and Chrome released from M2a implants are toxic.

o.  Biomet Defendants intentionally misrepresented the existence of concern over heavy metal wear in order to market and profit from the sale of M2a implants.

p.  Biomet Defendants deceptively engaged in marketing the M2a through the M2a design surgeon by not revealing their financial relationship in marketing literature, such as "The Rationale for Metal-on-Metal Total Hip Arthroplasty."

q.  Biomet Defendants failed to inform the orthopedic community in the United States regarding the Isala Clinic's finding of the need for advanced screening protocols in order to diagnose heavy metal poisoning in M2a patients; instead Biomet Defendants continued to heavily promote M2a products.

r.  Biomet Defendants failed to inform the orthopedic community in the United States regarding Turku University's finding of heavy metal poisoning in over half of the patients who received an M2a and of Turku University's warning claiming that they "discourage use of this device."

s.  Biomet Defendants failed to inform the public that the M2a posterchild, Mary Lou Retton, had both of her M2a implants fail due to heavy metal poisoning.

t.  Biomet Defendants continued to falsely claim Mrs. Retton as a "patient success story."

u.  Biomet Defendants failed to inform United States citizens and surgeons of the international recalls, hazard alerts, and safety notices related to its M2a.

     v.    Biomet Defendants employed the M2a design surgeon to alter the orthopedic community's perception of the failures of past generations of metal on metal implants and to falsely market current metal on metal technology, including the M2a, as having no (or minimal) risk of wear-related pathological reaction.

4. Defendants concealed this information both prior to and subsequent to the implantation of Plaintiff's M2a.

5. Defendants concealed this information and provided its misrepresentations with the intent that Plaintiff and Plaintiff's orthopedic surgeon rely upon such misrepresentation and concealments, and with intent that the orthopedic community and Plaintiff, through Plaintiff's doctors, rely upon the misrepresented safety record of the M2a.

6. Defendants knew prior to the M2a being implant in Plaintiff, that cobalt chromium metal on metal hips were unreasonably dangerous and that the clinical history of the technology did not support its continued use. Despite this knowledge, Defendants knowingly and willfully concealed material information about the dangerous propensities of cobalt chromium metal on metal hips, including the M2a, in an effort to promote and financially benefit from the sales of the M2a.

7. Plaintiff, through Plaintiff's physician, did rely upon Defendants' misrepresentations.

8. The above referenced reliance by Plaintiff and Plaintiff's physician was reasonable.

9. The fraudulent concealment from Plaintiff and Plaintiff's physician was material to the use and installation by Plaintiff's physician.

10. The fraudulent concealment from Plaintiff and Plaintiff's physician was material to Plaintiff in the decision to have the M2a products installed in his body.

11. As a result of Defendants' fraudulent concealment, Plaintiff was injured as alleged herein.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY FAILURE TO WARN
### AGAINST ZIMMER BIOMET DEFENDANTS

1. Plaintiff incorporates by reference Paragraphs 1 through 195 as though set forth fully herein.

2. At the time Defendants designed, manufactured, promoted, marketed, sold, supplied, distributed and/or serviced the products at issue in this Complaint, such products contained defects that made them unreasonably dangerous beyond the expectations of the ordinary consumer, and were unfit for their intended use.

3. The M2a reached Plaintiff without substantial change in the condition in which it was designed, developed, promoted, manufactured, and sold.

4. At the time and on the occasion in question, the M2a was being properly used for the purpose for which it was intended, and such device was in fact defective, unsafe and unreasonably dangerous.

5. The foreseeable risk of harm from the defects in the M2a could have been reduced or avoided by providing adequate instructions or warnings.

6. Defendants did not provide adequate instructions or warnings regarding the M2a which were known by Defendants or should have been known by Defendants.

7. The State of Florida recognizes a post-sale duty to warn as set forth in *High v. Westinghouse Elec. Corp.,* 610 So. 2d 1259 (Fla. 1992) and *Sta-Rite Indus., Inc. v. Levey*, 909 So.2d 901 (Fla. 3d DCA 2004) which imposes upon all Defendants a continuing duty to warn regarding the risks of harm associated with the M2a.

8. Defendants had sufficient notice about specific dangers associated with the M2a.

9. Despite knowledge of dangers actually discovered or which reasonably should have been discovered after the product was implanted in Plaintiff; despite knowledge of the

dangers actually discovered or which reasonably should have been discovered after the merger and due diligence period occurred; despite knowledge that the risks contained in the package insert had been modified post-implant into Plaintiff; despite knowledge of the recall of the product outside of the United States; and having knowledge that the M2a device was implanted into Russell Hanson; all of the Defendants failed to warn Plaintiff of risks associated with the product and the risks of allowing the product to remain in Plaintiff's body without medical monitoring.

10. Defendants failed and continue to fail to provide adequate instructions or warnings regarding the defects in the M2a which were known by Defendants or should have been known by Defendants and could have been provided.

11. Defendants failed to exercise reasonable care to inform Plaintiff, Plaintiff's doctors, and the medical community about dangers regarding the M2a that Defendants knew or should have known before and after the M2a was sold.

12. As a direct and proximate result of the lack of reasonable and adequate instructions or warnings regarding the defects in the M2a, Plaintiff suffered the injuries and damage as described herein.

## FOURTH CAUASE OF ACTION
## STRICT LIABILITY- DESIGN AND MANUFACTURING DEFECT
## AGAINST BIOMET DEFENDANTS

1. Plaintiffs incorporate by reference Paragraphs 1 through 207 as though set forth fully herein.

2. At the time that defendants designed, manufactured, promoted, marketed, sold, supplied, distributed and/or serviced the products at issue in this Complaint, such components contained defects that made them unreasonably dangerous beyond the

expectations of the ordinary consumer, and were unfit for their intended use, including but not limited to the following defects:

a. The design of the M2a caused it to generate excessive cobalt and chromium metal debris into the body;

b. The surface roughness of the M2a was not within acceptable standards and specifications;

c. The thickness, porosity, tensile strength of the plasma porous spray coating was not within acceptable standards and/or specifications;

d. The plasma porous spray coating utilized was not designed to be utilized on the acetabular cup of the M2a;

e. The plasma porous spray coating contributed to generating excessive metal wear debris;

f. The design of the acetabular cup caused it to fail to obtain bone ingrowth;

g. The claimed advantages of the M2a did not justify the additional risks created by metal debris of the M2a as compared to non-metal on metal hip replacements on the market;

h. The design of the M2a caused excessive corrosion as compared to other hip replacement products on the market;

i. The design of the M2a caused the taper adapter and stem to cold weld;

j. The design of the instrumentation, including the inserter tools, resulted in excessive failures.

3. The M2a reached Plaintiff without substantial change in the condition in which it was sold.

4. At the time and on the occasion in question, the M2a was being properly used for the purpose for which it was intended, and such device was in fact defective, unsafe and unreasonably dangerous.

5. The M2a, for the reasons previously set forth herein, was defective, unsafe and unreasonably dangerous in design and manufacture.

6. As a direct and proximate result of the defects in the M2a, Plaintiff suffered the injuries and damages described herein.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY AGAINST BIOMET DEFENDANTS

1. Plaintiffs incorporate by reference Paragraphs 1 through 169 as though set forth fully herein.

2. Biomet Defendants impliedly warranted that the products at issue in this Petition and its component parts were merchantable and fit for the ordinary and intended purposes for which hip systems are used.

3. Plaintiff was a foreseeable user of the products at issue in this Petition.

4. Plaintiff's surgeon, as a purchasing agent, purchased the products at issue in this Complaint for Plaintiff from Biomet Defendants.

5. At all times relevant to this Complaint, Plaintiff was in privity with the Biomet Defendants.

6. Plaintiff used the products at issue in this Petition for its ordinary and intended purpose.

7. The products at issue in this Complaint failed while being used for their ordinary and intended purpose.

8. As a direct and proximate result of Biomet Defendant's breach of implied warranty, Plaintiffs suffered injuries and damages described herein.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY AGAINST BIOMET DEFENDANTS

1. Plaintiffs incorporate by reference Paragraphs 1 through 221 as though set forth fully herein.

2. Biomet Defendants sold and Plaintiff purchased, through Plaintiff's purchasing agent surgeon, the products at issue in this Petition.

3. At all times relevant to this Petition, Plaintiff was in privity with Biomet Defendants.

4. Biomet Defendants expressly warranted by affirmation, promise, description, and sample to Plaintiff and Plaintiff's physician that the products at issue in this Petition were of a quality and character suitable for implantation and extended safe use in Plaintiff.

5. Biomet Defendants warranted that the M2a was a "lifetime" hip.

6. Such representations by Biomet Defendants were meant to induce Plaintiff, through Plaintiff's physician, to purchase the products at issue in this Petition.

7. The products at issue in this Complaint did not conform to the warranties and representations made by Biomet Defendants.

8. Biomet Defendants breached the express warranties it provided with the products at issue in this Complaint.

9. As a direct and proximate result of Biomet Defendant's breach of express warranties, Plaintiff suffered injuries and damages described herein.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION AGAINST BIOMET DEFENDANTS**

1. Plaintiffs incorporate by reference Paragraphs 1 through 230 as though set forth fully herein.

2. Defendants made statements concerning material facts which Defendants may have believed to be true but which in fact were false, or otherwise omitted material facts including the statement and omission set forth in Sections D, E, F, G, H, I, J, K, L, M, S, V, W.

3. As stated above, Defendants, through sales literature, marketing materials, meetings, and verbal communications, medical publications, seminars and in the course of their

business, made misrepresentations of material facts about the M2a and/or concealed information about the M2a from Plaintiff and his orthopedic surgeon prior to Plaintiff's surgeries in 2007including, but not limited to:

   a. Misrepresenting the M2a is designed to reduce wear and provide higher function for all patients;

   b. Misrepresenting the M2a is clinically proven to reduce wear;

   c. Misrepresenting the M2a is based on a strong clinical history and reduces wear compared to the traditional hip replacement;

   d. Misrepresenting the M2a is designed to be installed in younger and more active patients and will last longer than its competitors;

   e. Misrepresenting the success rate of the M2a;

   f. Failing to disclose that the metal used for the M2a was prone to increased wear and caused excessive metal debris;

   g. Failing to disclose the M2a failed to obtain bony ingrowth and became loose;

   h. Failing to disclose that they were aware of and/or witnessed revision surgeries in which the M2a had failed, including becoming loose, causing metallosis, excessive wear and corrosion on the neck stem, dislocations, fractures of hardware, loose acetabular components, pseudotumors, ALVAL, ARMD and infection; and

   i. Failing to disclose that orthopedic surgeons were complaining about the M2a and were experiencing difficulty in installing the M2a.

4. Defendants made these misrepresentations of material fact and/or concealments of information about the M2a from Plaintiff and Plaintiff's orthopedic surgeon, prior to Plaintiff's surgery, and continued the misrepresentations and omissions thereafter.

5. Defendants were negligent in making such statements and/or concealing information because they should have known the statements were false or omitted material information.

6. In making these statements and/or omissions, Defendants intended or expected that

Plaintiff and others would rely on the statements and/or omissions.

7. Prior to Plaintiff's surgery, Plaintiff and his orthopedic surgeon were induced to act in reliance on Defendant's misrepresentations and/or omissions and in fact purchased the M2a and installed the M2a in Plaintiff's hip.

8. Defendants failed to exercise ordinary care in making the above representations and/or omissions and instead made the above representations and/or omissions knowing the representations were false or were ignorant of the truth of the assertion.

9. Plaintiff and his orthopedic surgeon relied on the truth of Defendant's representations and/or omissions about the M2a and had a right to rely on such.

10. Plaintiff was ignorant of Defendant's misrepresentations and/or omissions.

11. As a direct and proximate result of the negligent misrepresentations and omissions regarding the M2a, Plaintiffs suffered injuries and damages as described herein.

## EIGHTH CAUSE OF ACTION
## NEGLIGENCE AGAINST ALL DEFENDANTS

1. Plaintiffs incorporate by reference Paragraphs 1 through 241 as though set forth fully herein.

2. Defendants, as the designers, manufacturers, promoters, marketers, sellers, suppliers, distributors, and/or servicers of the Biomet M2a hip replacement system, owed a duty to use reasonable care in the design, manufacture, promotion, marketing, selling, supplying, distribution, and/or service of Plaintiff's hip replacement.

3. Defendants, in breach of the duties described above, negligently and carelessly designed, manufactured, promoted, marketed, sold, supplied, distributed and/or serviced the products at issue in this Complaint.

4. Further, Defendants owed Plaintiff a duty to provide reasonable complete and accurate information to Plaintiff, Plaintiff's orthopedic surgeon, and the orthopedic community regarding the products at issue in this Complaint.

5. Defendants had a duty to adequately warn Plaintiff of defects in the M2a which it knew or should have known about.

6. Defendants had a continuing, post-sale, duty to warn Plaintiffs and others of unreasonable risks of harms associated with the M2a.

7. Defendants breached the above duties by failing and continuing to fail to adequately warn Plaintiffs, Plaintiff's orthopedic surgeon, and the orthopedic community regarding risks and dangers of the M2a.

8. Defendants, in breach of the duties described above, negligently and carelessly designed, manufactured, promoted, marketed, sold, supplied, distributed and serviced the M2a hip replacement components implanted in Plaintiff.

9. Defendants, in breach of the duties described above, negligently and carelessly failed to provide reasonable, complete, and accurate information to Plaintiff, his orthopedic surgeon, and the orthopedic community regarding Plaintiff's M2a.

10. As a direct and proximate result of Defendants' breaches of duty, Plaintiff needlessly suffered injuries and damages as described herein.

**NINTH CAUSE OF ACTION**
**INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS**
**AGAINST ALL DEFENDANTS**

1. Plaintiffs incorporate by reference Paragraphs 1 through 251 as though set forth fully herein.

2. Plaintiff's purchase of the M2a was a business transaction.

3.  The Defendants all had a pecuniary interest in the design, development, testing, promotion, marketing and sale of the M2a.

4.  The Defendants supplied false information for the guidance of others regarding the selection of the M2a as a safe and effective hip replacement option, as alleged above.

5.  The Defendants failed to exercise reasonable care or competence in obtaining and communicating the information supplied for the guidance of others regarding the M2a.

6.  Plaintiff, and Plaintiff's orthopedic surgeon agent, were within the limited group of persons for whose benefit and guidance the Defendants intended to supply the information.

7.  The Defendants intended for their information to influence either the transaction in which Plaintiff, through Plaintiff's orthopedic surgeon agent, purchased the M2a or a substantially similar transaction.

8.  Plaintiff, individually and through Plaintiff's orthopedic surgeon agents, justifiably relied upon the information provided by Defendants.

9.  As a direct and proximate result of the Defendants' false information, Plaintiff suffered pecuniary loss, injury and damages as described herein.

## TENTH CAUSE OF ACTION
## DECEPTIVE TRADE PRACTICES AGAINST BIOMET DEFENDANTS

1.  Plaintiffs incorporate by reference Paragraphs 1 through 260 as though set forth fully herein.

2.  The actions of the Biomet Defendants discussed above amount to deceptive acts and trade practices.

3.  As the result of the Biomet defendants' deceptive acts and trade practices, Plaintiff has suffered damages and personal injuries as set forth in this Complaint.

4. Plaintiff seek to recover their actual damage and attorneys' fees from the Biomet defendants pursuant to the provisions of Florida Statute § 501.201 et seq.

## ELEVENTH CAUSE OF ACTION (in the alternative)
## OHIO PRODUCTS LIABILITY ACT AGAINST BIOMET DEFENDANTS

1. Plaintiffs incorporate by reference Paragraphs 1 through 264 as though set forth fully herein.

2. The M2a utilized in Plaintiff's implant surgery were ethical medical devises as defined in Ohio Revised Code 2307.71.

3. The M2a utilized in Plaintiff's implant surgery was defective in manufacture or construction because when left the control of the Biomet Defendants, they deviated in a material way from design specifications, formula, or performance standards of the manufacturer as provided and is further outlined in Ohio Revised Code Section 2307.74.

4. The M2a utilized in Plaintiff's implant surgery was defective in design or formulation at the time it left the control of its manufacturer, the Biomet Defendants, in that the foreseeable risks associated with the design exceeded the benefits associated with that design and as further outlined in Ohio Revised Code Section 2307.75.

5. The M2a utilized in Plaintiff's implant surgery was defective due to inadequate warning or instruction at the time it left the control of its manufacturer, the Biomet Defendants, due to inadequate warning or instruction and because the Biomet Defendants failed to provide the warning or instruction that a manufacturer, exercising reasonable care, should have provided concerning the risk as further outlined in Ohio Revised Code Section 2307.76.

6. As a direct and proximate result of Defendants' conduct, Plaintiff needlessly suffered injuries and damages as described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, pray for relief and judgment against Defendants as follows:

a) For general damages in a sum in excess of the jurisdictional minimum of this Court;

b) For medical, incidental, and hospital expenses; both past and future according to proof;

c) For Past and future lost wages and loss of income:

d) For pre-judgment and post-judgment interest as provided by law;

e) For a full refund of all purchase costs Plaintiff paid for the M2a system;

f) For compensatory damages in excess of the jurisdictional minimum of this Court;

g) For consequential damages in excess of the jurisdictional minimum of this Court;

h) For attorneys' fees, expenses, and costs of this action; and

i) For such further relief as this Court deems necessary, just and proper.

Date:   September 16, 2022            BACHUS & SCHANKER, LLC

*/s/J. Kyle Bachus*
J. Kyle Bachus, FL # 969745
Darin L. Schanker, CO # 23381,
*to be admitted Pro Hac Vice*
Melanie Sulkin, CO # 49944,
*to be admitted Pro Hac Vice*
101 W. Colfax Avenue, Ste. 650
Denver, CO 80202
T: (303) 893-9800
F: (303) 893-9900
E: Kyle.Bachus@ColoradoLaw.Net
E: DSchanker@ColoradoLaw.Net
E: Melanie.Sulkin@ColoradoLaw.Net

44

**PLEASE SERVE:**

**BIOMET, INC.**
*Through Registered Agent,*
Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301

**BIOMET ORTHOPEDICS, LLC**
*Through Registered Agent,*
Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301

**BIOMET U.S. RECONSTRUCTION, LLC**
*Through Registered Agent,*
Corporation Service Company
135 North Pennsylvania Street, Suite 1610
Indianapolis, Indiana 46204

**BIOMET MANUFACTURING, LLC f/k/a**
**BIOMET MANUFACTURING CORPORATION**
*Through Registered Agent,*
Corporation Service Company
135 North Pennsylvania Street, Suite 1610
Indianapolis, Indiana 46204

**ZIMMER BIOMET HOLDINGS, INC.**
*Through Registered Agent,*
Corporation Service Company
135 North Pennsylvania Street, Suite 1610
Indianapolis, Indiana 46204